UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


<u>United States</u>

     v.                      Criminal No. 16-cr-96-01-JD
                                 Opinion No. 2017 DNH 083

<u>Eric Tanguay</u>


O R D E R

Eric Tanguay is charged with possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Tanguay moves to suppress all evidence obtained from a vehicle that he was driving when he was arrested. The government opposes the motion.

The court held a hearing on the motion to suppress on March 21, 2017. During the hearing, the government presented testimony from Nashua police officer Adam Rahyo, who participated in the arrest and search. The defense called no witnesses.


Standard of Review

The defendant bears a threshold burden to show a Fourth Amendment violation in support of a motion to suppress. United States v. Young, 835 F.3d 13, 19 (1st Cir. 2016); see also Rakas v. Illinois, 439 U.S. 128, 132 n.1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own

Fourth Amendment rights were violated by the challenged search or seizure.").  The defendant's threshold burden includes the "burden of establishing that he was seized." United States v. Fields, 823 F.3d 20, 25 (1st Cir. 2016).  Once the defendant shows that a warrantless search or seizure occurred, the government bears the burden of showing that the warrantless search or seizure was nevertheless lawful.  United States v. Winston, 444 F.3d 115, 123–24 (1st Cir. 2006); United States v. Acosta-Colon, 157 F.3d 9, 14 (1st Cir. 1998).

## Background

In the early morning of March 31, 2016, Rayho, dressed in his police uniform, was on patrol in a marked police SUV.  A little after midnight, Rayho drove by a strip mall parking lot and noticed a blue Ford SUV (the "Ford") parked with two people inside.  The Ford was parked 100 to 150 feet from a Taco Bell restaurant and no other vehicles were around it.  Rayho returned to the lot about twenty minutes later and noticed that the Ford was still there.  Rayho knew that most of the businesses located around the lot were closed but that the Taco Bell and a 24-hour gym remained open.  Rayho became concerned about the Ford because it was parked alone.  Based on his concern, Rayho entered the lot and approached the Ford.  The time was 12:29 a.m.

Rayho parked his car seven to ten feet behind the Ford. Rayho then turned on his rear blue strobe lights, which pointed away from the Ford. Rayho did so because the parking lot was dark and he wanted to alert any officer providing backup as to his location. Rayho also turned on his front spotlights,[1] which illuminated the interior of the Ford. Rayho testified that he turned these lights on for officer safety purposes.

Rayho then approached the Ford on the driver's side. Using his flashlight to illuminate the Ford's interior, Rayho began a conversation with Tanguay, the driver, and Jacqueline Westley, the passenger. Rayho asked Tanguay and Westley for their names, which they gave him. Rayho recognized the name "Eric Tanguay" because a confidential informant in an unrelated investigation had told him that someone with that name was involved in using and distributing controlled narcotics. Rayho then asked Tanguay and Westley what they were doing in the parking lot. They told Rayho that they were eating food from Taco Bell. Rayho then joked with them that he also enjoyed eating food from Taco Bell. Rayho saw that both Tanguay and Westley were, in fact, eating Taco Bell food.

---

[1] Although Rayho called these lights "takedown lights," he testified that they were essentially spotlights.

Rayho asked Tanguay and Westley for identification.  They
responded that they did not have a driver's license with them.
Tanguay also informed Rayho that he did not own the Ford.  Rayho
asked Tanguay if there were any weapons or drugs in the car, and
Tanguay said there were not.

Rayho asked Tanguay if it would be all right if he returned
to his cruiser to run a records check on him.  Rayho testified
that one of the reasons he made this request was to determine if
the Ford had been reported as stolen.  Tanguay agreed and
assured Rayho that he had a valid driver's license.  As Rayho
was returning to his cruiser, he noticed that Officer Jonathan
Earnshaw had arrived to provide backup.  Earnshaw's cruiser was
parked behind Tanguay's vehicle.  About a minute into the
records check, Rayho observed Westley crouching down and
appearing to reach under the seat.  Rayho was concerned about
Westley's movements.  As a result, he immediately stopped the
records check, exited his cruiser, and walked back to the
driver's side of the Ford.

When Rayho got to the Ford, he noticed that Westley was
sitting upright in her seat.  Rayho then asked Tanguay again
whether he had any identification.  This time, Tanguay said that
his driver's license was in the trunk and asked if he could
retrieve it.  Rayho agreed to let Tanguay show him the location
of his license but said that he would prefer to retrieve the

license for officer safety reasons.  Tanguay got out of the
Ford, and, as he did, Rayho observed what appeared to be the
butt of a pistol tucked into the driver's side door.

Tanguay and Rayho walked to the rear of the Ford.  Tanguay
told Rayho that his license was in a backpack in the trunk.
After the trunk was opened, Tanguay informed Rayho that his
license was inside a wallet in a small pouch of the backpack.
Rayho retrieved the wallet from the backpack and removed
Tanguay's driver's license.  Rayho noticed a large amount of
currency in the wallet, which Tanguay told him totaled around
$2,000.[2]  Rayho also noticed that the largest compartment of the
backpack was secured with a padlock.

While still at the rear of the Ford, Rayho asked Tanguay
about the gun in the driver's side door.  Tanguay told Rayho
that it was a BB gun and apologized for not telling Rayho about
it earlier.  Tanguay also told Rayho that he had a conceal carry
permit but did not have that with him.

Rayho told Tanguay that he was going to check the gun to
determine whether it was a BB gun.  Before checking the gun,
Rayho asked Westley to get out of the Ford, which she did.
After checking the gun, Rayho concluded that it was, in fact, a
BB gun.  Rayho then asked Tanguay for consent to search the

---

[2] Rayho testified that the money in Tanguay's wallet was
subsequently counted and that it totaled around $2,800.

remainder of the Ford.[3]  Tanguay responded that such a search was "fine."

During the search, Rayho, with the help of his flashlight, peered under the passenger's seat where Westley had been sitting.  There he found a partially opened black sunglass case, which held a hypodermic needle.  Rayho removed the sunglass case, which was already partially opened, and opened it the rest of the way.  Rayho saw that the hypodermic needle was loaded and contained a brownish liquid.  Based on Rayho's training, he believed that the brown liquid was either heroin or fentanyl. The sunglass case also contained a pill, a cotton ball, and a form of Narcan, which is a medication used to treat opiate overdoses.

After discovering the sunglass case, Rayho asked Westley if she could come to the front of the Ford to speak with him. Westley agreed, and Rayho asked her what she and Tanguay had been doing that night.  Initially, Westley said that she and Tanguay had the Ford all evening and were at their friend Dennis Higgins's house.  When confronted with the loaded hypodermic needle, however, Westley told Rayho that her friend Danielle had borrowed the Ford while they were at Higgins's house.  Westley did not provide any information about Danielle.  Rayho then

_____

[3] Rayho's affidavit states that he requested Tanguay's consent to search the Ford "for weapons."

asked Westley again if she had a driver's license and this time she retrieved a temporary New Hampshire driver's license from her purse.

Rayho then asked Tanguay if he could speak with him. Tanguay agreed. During their conversation, Tanguay told Rayho that he and Westley had been at Higgins's house that night but that no one had borrowed the Ford while they were there. Tanguay also told Rayho that he saw Westley with the sunglass case and that he believed that there were drugs in the case because he knew that Westley was a drug user. Rayho then arrested Westley, who was taken to the Nashua Police Department.

Rayho and Tanguay then moved to the rear of the Ford where Rayho asked Tanguay about the lock on his backpack. Rayho observed that Tanguay appeared to become very nervous. Tanguay stared back at Rayho, as if he were trying to think of an answer. Tanguay eventually told Rayho that an "unknown individual" had placed a lock on the backpack. Rayho arrested Tanguay at approximately 12:55 a.m. for possession of drugs in a motor vehicle. Earnshaw drove Tanguay to the police station.

Rayho tried to call the registered owner of the Ford but was unsuccessful. Because he could not locate the owner, Rayho called a tow truck to remove the Ford from the lot. Rayho removed Westley's purse, the backpack, and two cell phones in order to bring them back to the police department. Rayho also completed an inventory form documenting the items left in the Ford. During this process, Rayho completed a records check on the Ford and determined that the Ford had not been reported as being stolen. The Ford was then towed to an independent tow yard. At the police station, the purse was placed with Westley's personal property and the cell phones were placed with Tanguay's personal property. Rayho kept the backpack for safekeeping and because he wanted to ask Tanguay about it.

At around 3:30 a.m., Tanguay agreed to a post-Miranda, unrecorded interview.[4] Rayho brought the backpack into the interview room and asked Tanguay about it. Tanguay sighed and put his hands on his head. He told Rayho that the backpack was his. He then informed Tanguay that he believed that there was something illegal in the backpack. He further elaborated that an unnamed person had put three to five illegal items in his backpack earlier and then placed the lock on it. Tanguay also

---

[4] Before beginning the interview, Rayho reviewed Tanguay's <u>Miranda</u> rights with him, and Tanguay signed a form indicating that he understood those rights.

asked Rayho what his bail would be if there were multiple
illegal items in his backpack.  Rayho responded that he did not
know what the bail would be because he was not a bail
commissioner.[5]

Rayho then asked Tanguay for his consent to search the
backpack. Rayho informed Tanguay that he could refuse to consent
but that he believed there was probable cause for a search
warrant.  Rayho also informed Tanguay that because of the time
he would not seek a warrant until later in the day.  Rayho
explained to Tanguay that if he refused to consent to the
search, his bail would be set for his misdemeanor charges but
other charges might follow at a later date if he found anything
illegal in the backpack.  Tanguay consented to a search of the
backpack.

Tanguay's consent was memorialized in a Nashua Police
Department consent to search form.  Rayho prepared the form by
filling in the necessary information, including indicating that
the item to be searched was Tanguay's backpack.  After filling
out the form, Rayho gave it to Tanguay to read.  The form, as
completed, provided that Tanguay had "been informed of [his]
Constitutional Right not to have a search made of my [backpack]

---

[5] At some point during the interview, the Bail Commissioner
entered the room and asked Rayho if the interview was done.
Rayho responded that the interview had not yet finished.

without a Search Warrant and of my right to refuse to consent to such a search." Tanguay informed Rayho that he understood the form and had no questions. Tanguay then signed the form.

Rayho next removed the lock with bolt cutters. Inside the main compartment Rayho found several items, including pills, which he believed were prescription medication, 49.1 grams of methamphetamine, 30.94 grams of fentanyl, drug paraphernalia, and an electric scale. Rayho also found pieces of mail that had Tanguay's name on them.

## Discussion

Tanguay contends that the evidence obtained from the Ford and the backpack should be suppressed because it is the result of illegal seizures and searches. In support, Tanguay argues that Rayho stopped him without any legal basis and that the stop exceeded the scope of the Fourth Amendment's limits. Tanguay also argues that the evidence should be suppressed because the warrantless searches of the Ford and the backpack violated the Fourth Amendment.

In response, the government argues that Rayho properly stopped Tanguay and that the search of the Ford was justified based on the consent exception to the warrant requirement. The government also contends that the search of the backpack was

justified under the consent, automobile, and inevitable
discovery exceptions to the warrant requirement.

I.  Seizure

    The Fourth Amendment protects "the right of people to be
secure . . . against unreasonable searches and seizures." U.S.
Const. Amend. IV.  The Fourth Amendment's protections against
unreasonable seizures "apply not only to traditional arrests,
but also to . . . brief investigatory stops generally known as
Terry stops." Fields, 823 F.3d at 25 (internal quotation marks
omitted).

    For a stop to be legal, it must be objectively reasonable
based on two inquiries. United States v. Arnott, 758 F.3d 40,
43 (1st Cir. 2014).  First, "police are not allowed to make an
initial stop unless they have a reasonable, articulable
suspicion about an individual's involvement in some criminal
activity." Id.  Second, "[i]f the initial stop passes muster,
actions undertaken during the course of the stop must be
reasonably related in scope to the stop itself unless the police
have a basis for expanding their investigation." Id. (internal
quotation marks omitted).

    Tanguay argues that Rayho illegally stopped him when Rayho
approached the Ford and began asking him questions.  In support,
Tanguay asserts that the Ford was legally parked and he and

Westley were doing nothing ostensibly illegal.  In addition,
Tanguay contends that the scope of the stop exceeded the limits
for Terry stops.

In response, the government argues that the initial
interaction between Rayho and Tanguay was a consensual
encounter, not a stop implicating the Fourth Amendment's
protections.  Additionally, the government contends that
although this encounter eventually became an investigatory stop,
that was justified by reasonable suspicion.  The government also
argues that the stop was not illegal in scope because Rayho's
actions were justified based on the circumstances that existed
as the encounter progressed and events unfolded.

A.  Initial Encounter

The parties agree that an investigatory stop occurred at
some point during the encounter.  They disagree, however, about
when that occurred.  Tanguay contends that the encounter became
a stop almost immediately and that there was no reasonable
suspicion to support a stop at that time.  The government, on
the other hand, argues that Rayho did not initiate a stop until
he learned that Tanguay did not have a license and was not the
registered owner of the Ford.

"Not every police-initiated conversation is a seizure."
United States v. Espinoza, 490 F.3d 41, 48 (1st Cir. 2007).

Rather, some interactions with police are consensual encounters that do not implicate the Fourth Amendment's protections.  Florida v. Rodriguez, 469 U.S. 1, 5-6 (1984). For instance, "a law enforcement officer does not trigger an individual's Fourth Amendment protections simply by approaching the person in public and asking routine questions."  Espinoza, 490 F.3d at 48.  Similarly, "[a]s a matter of law, approaching a parked car and questioning the occupant does not necessarily rise to the level of a Terry stop."  United States v. Taylor, 511 F.3d 87, 91 (1st Cir. 2007) (internal quotations omitted).

A police officer's interaction with a person becomes a seizure when the officer makes a "show of authority."  Fields, 823 F.3d at 25.  A show of authority occurs when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  Id. (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)). This test "focuses on whether the conduct of law enforcement objectively communicates that law enforcement is exercising its official authority to restrain the individual's liberty of movement."  Id. (internal quotation marks omitted).  The burden is on Tanguay "to establish the show of authority that is the

necessary predicate for his claimed Fourth Amendment violation."
Fields, 823 F.3d at 31.

The Supreme Court has identified the following non-exhaustive circumstances that might indicate a seizure: "(1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled." United States v. Smith, 423 F.3d 25, 29 (1st Cir. 2005) (citing Mendenhall, 446 U.S. at 554). Beyond those factors, the First Circuit has also assessed the degree to which police restricted or obstructed a person's freedom of movement. See Taylor, 511 F.3d at 91-92 (finding no seizure where parked car "was not in fact hemmed in from all sides and could have driven forward and turned left to exit the parking lot").

Tanguay contends that the combination of the two officers on the scene, Rayho's activation of his vehicle's spotlights and rear-facing strobe lights, and Rayho's use of his flashlight signaled that he was not free to leave. In response, the government argues that the totality of the circumstances did not constitute a seizure.

In this case, Rayho parked seven to ten feet behind the Ford. Based on that distance and the fact that the Ford was in an empty part of the parking lot, Tanguay could have driven out

of the lot.  When Rayho approached the Ford, its engine was running, and Rayho did not tell Tanguay to shut it off until later when he arrested him.  During their initial conversation, Rayho asked Tanguay and Westley routine and non-accusatory questions.  His tone was upbeat and friendly, and he did not instruct Tanguay that he had to stay in the lot.  Further, Rayho's weapon remained holstered, and there is no evidence that he touched Tanguay or Westley.  These facts weigh in favor of a conclusion that the initial encounter between Rayho and Tanguay was consensual.

Although Earnshaw was at the scene providing backup, his arrival was not a threatening presence that would weigh in favor of finding that a seizure occurred.  As an initial matter, the record is unclear about when Earnshaw arrived and whether he was in a position in which Tanguay could initially see him.  In any case, there is no evidence that Earnshaw did anything to block Tanguay's exit, and during the initial encounter Earnshaw did not speak to, approach, or touch Tanguay or Westley.  See Fields, 823 F.3d at 28 (no seizure where four officers providing backup did not block suspect or participate in encounter).  Moreover, the addition of one officer providing backup does not amount to "the threatening presence of several officers." Smith, 423 F.3d at 29 (emphasis added); see also Fields, 823 F.3d at 28 (four officers not a seizure).

Tanguay also argues that Rayho's use of his vehicle's spotlights and his flashlight to illuminate the Ford signaled that he was not free to leave.  Generally, the use of lights, including spotlights, to illuminate a vehicle in the dark does not convert an otherwise consensual encounter into a seizure. See Texas v. Brown, 460 U.S. 730, 739-40 (1963); United States v. Lawhorn, 735 F.3d 817, 820 (8th Cir. 2013) ("[The] act of shining a spotlight on a person's car typically does not constitute a seizure."); United States v. Douglass, 467 F.3d 621, 624 (7th Cir. 2006) (holding that officer's use of flashlights was "insignificant" under free to leave test); State v. Baker, 107 P.3d 1214, 1218 (Idaho 2004) ("This Court joins the many other jurisdictions which have held that the use of a spotlight alone would not lead a reasonable person to believe that he was not free to leave, though it may be considered under the totality of the circumstances."); People v. Cascio, 932 P.2d 1381, 1388 (Colo. 1997) (flashlights and spotlights used "as a matter of practical necessity as the encounter took place when it was getting dark, and we do not attribute any significance to their use").

Here, there is no evidence that Rayho used his spotlight or flashlight for any purpose other than illuminating the Ford as he approached.  Nor is there any evidence that Rayho used the spotlight or flashlight in an intrusive manner.  Given these

facts, and the time when the encounter occurred, Rayho's use of his spotlight and flashlight do not weigh in favor of finding a show of authority.

Rayho's use of his rear emergency lights presents a closer question. While a vehicle is in motion, the sight of emergency lights is an unmistakable signal to the driver that he must stop and pullover. United States v. Woodrum, 202 F.3d 1, 9 (1st Cir. 2000). Nevertheless, where, as here, a vehicle has stopped voluntarily, "[c]ourts . . . recognize that under some circumstances, an officer's conduct in pulling behind a parked vehicle and activating a squad car's flashing lights does not result in a seizure." United States v. Cook, 2015 WL 224721, at *3 (D. Minn. Jan. 15, 2015) (collecting cases), aff'd, 842 F.3d 597 (8th Cir. 2016); United States v. Clements, 522 F.3d 790, 794-95 (7th Cir.2008) (finding no seizure where officers used flashing lights to identify themselves before approaching parked vehicle at night).

Moreover, a number of courts have concluded that the activation of rear-facing emergency lights does not necessarily convert a consensual encounter into a seizure. See People v. Biagi, 68 N.E.3d 829, 837-38 (Ill. App. Ct. 2017) (takedown lights and rear emergency lights do not indicate seizure); VanLowe v. State, 2014 WL 5780229, at *3-4 (Tex. App. Nov. 6, 2014) (not designated for publication); United States v. Mabery,

686 F.3d 591, 594, 596 (8th Cir. 2012); State v. Steeves, 158 N.H. 672, 676 (2009) (officer "did not effectuate a seizure by activating the rear blue lights"); Clarke v. Com., 527 S.E.2d 484, 491 (Va. Ct. App. 2000).

Here, Rayho did not activate his vehicle's front-facing lights, and thus did not employ the signal that police ordinarily use to communicate to a motorist that he or she must stop. United States v. Cook, 842 F.3d 597, 601 (8th Cir. 2016) (no seizure where officer's use of overheard wig-wag lights was "different from the full light bar which is used to notify motorists in moving vehicles that they are required to stop"). Moreover, the strobe lights that Rayho did employ were pointing away from Tanguay and the Ford. Finally, there are valid safety reasons why an officer would activate his vehicle's rear emergency lights during a consensual encounter occurring in the dark, including signaling his presence to others drivers and those with whom he is about to interact. Under these circumstances, and given the absence of any other coercive police conduct, the court concludes that a reasonable person in Tanguay's position would not have believed that Rayho's use of rear-facing strobe lights was a show of authority.

Therefore, based on the totality of the circumstances, the initial encounter between Rayho and Tanguay was a consensual

encounter that did not implicate the Fourth Amendment's protections.[6]

B.  Initial Justification for Stop

The government concedes that Rayho's encounter with Tanguay and Westley eventually became an investigatory stop.  It argues, however, that the stop was justified because Rayho had reasonable suspicion that criminal activity was afoot.  In support, the government points to the fact that Tanguay said that he did not have a license with him and was not the owner of the Ford.  In response, Tanguay argues that there was no reasonable suspicion of criminal activity at that time.

As discussed above, police may conduct Terry stops when they have "a reasonable, articulable suspicion about an individual's involvement in some criminal activity." Arnott, 758 F.3d at 43.  That suspicion must be "grounded in specific and articulable facts," which "must amount to more than a mere hunch but less than probable cause." United States v.

---

[6]  Tanguay argues that Rayho's testimony demonstrates that "[h]e did not believe the defendant could pull away while he [was] having conversation with him."  The testimony Tanguay cites involved a hypothetical in which Tanguay sped away and "ran over" Tanguay's foot or attempted to injure him.  That hypothetical does not resemble the evidence concerning the encounter at issue.  More importantly, however, the subjective intent of Rayho "is irrelevant except insofar as that may have been conveyed to the respondent." United States v. Mendenhall, 446 U.S. 544, 555 (1980); see also Brendlin v. California, 551 U.S. 249, 259-60 (2007).

*Arias*, No. 15-1946, 2017 WL 655758, at \*3 (1st Cir. Feb. 17, 2017) (internal quotation marks omitted).  In determining whether reasonable suspicion existed, the court applies "an objective standard, rather than assessing the subjective intent of an individual officer" and considers "the totality of the circumstances."  *United States v. Tiru-Plaza*, 766 F.3d 111, 116 (1st Cir. 2014).  The government bears the burden of showing that reasonable suspicion existed.  *Woodrum*, 202 F.3d at 7.

After their initial conversation, Tanguay, who was behind the wheel of a vehicle with a running engine, told Rayho that he did not have a driver's license with him and that he was not the registered owner of the Ford.  Tanguay's lack of identification and his use of a vehicle owned by someone else provided reasonable suspicion that the Ford had been stolen.[7]  See *United States v. Cardona-Vicente*, 817 F.3d 823 (1st Cir. 2016) ("The driver of the car could not produce a driver's license, suggesting the Jeep may have been stolen."); *Tiru-Plaza*, 766 F.3d at 117 ("Morales failed to provide the police officers with a driver's license and a legible car registration.  Under these circumstances, it was reasonable for the officers

---

[7] The mere fact that Tanguay did not have a license on him raises some level of suspicion, given that New Hampshire drivers are required to be in possession of their licenses while driving.  See RSA 263:2.

to suspect that the car might have been stolen."); see also United States v. Hughart, 645 F. App'x 678, 683 (10th Cir. 2016) (officer had reasonable suspicion to detain driver after determining during the course of a consensual interaction that he did not have a license).  Accordingly, the investigative stop was initially justified by reasonable suspicion.

   C.  Scope of the Stop

Tanguay contends that the scope of the stop exceeded legal limits.  In support, Tanguay focuses on the events after Rayho abandoned the records check, which, he contends, were overly intrusive and proceeded despite the lack of reasonable suspicion.  Further, Tanguay argues that the duration of the stop was too long.  In response, the government contends that the scope of the stop was justified.

"Because a Terry stop allows an individual to be seized on less than probable cause, the extent of that intrusion must be limited."  United States v. Pontoo, 666 F.3d 20, 30 (1st Cir. 2011).  "If police actions associated with a Terry stop are too intrusive in nature or too long in duration, those limits are exceeded."  Id.  When a Terry stop exceeds its proper scope, it becomes a de facto arrest, requiring

probable cause. United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997).

A de facto arrest occurs when "in light of the totality of the circumstances a reasonable person in the suspect's position would have understood [his] position to be tantamount to being under arrest." United States v. Candelario-Santana, 834 F.3d 8, 18 (1st Cir. 2016) (internal quotation marks omitted), cert. denied, 137 S. Ct. 1112 (2017). In making this determination, courts look to, among other things, "the length of the detention, the restrictions placed on an individual's personal movement, the force (if any) that was exerted, the information conveyed to the detainee, and the severity of the intrusion." Pontoo, 666 F.3d at 30 (quoting United States v. Sowers, 136 F.3d 24, 28 (1st Cir. 1998)). "Above all, an inquiring court must bear in mind that 'it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.'" Id. (internal quotation marks omitted).

Whether a stop is appropriate in duration "is gauged by whether the officer diligently pursued a reasonable investigative approach calculated to ensure officer safety and, at the same time, confirm or dispel his suspicions." Id. at 31 (quoting United States v. Sharpe, 470 U.S. 675, 686-86 (1985)). A stop runs afoul of the Fourth Amendment when

an officer engages in investigative activity, absent reasonable suspicion, that prolongs the stop beyond the time reasonably required to complete its objective, which includes attending to "safety concerns." See United States v. Rodriguez, 135 S. Ct. 1609, 1615 (2015). Nevertheless, an officer may conduct certain unrelated inquiries "so long as [they] do not measurably extend the duration of the stop." Id. The government "bears the burden of demonstrating that [the] stop fell within the scope of Terry." Acosta-Colon, 157 F.3d at 19-20.

As discussed above, Rayho had a reasonable suspicion that the Ford had been stolen when Tanguay informed him that he did not have a license and was not the Ford's owner. After acquiring this information, Rayho returned to his vehicle to conduct a records check. This was a reasonable investigative approach to confirm or dispel his suspicions about the Ford. See United States v. Owens, 167 F.3d 739, 749 (1st Cir. 1999). Rayho aborted the records check, however, after observing Westley furtively reach under the seat. That decision was both reasonable and justified based on officer safety concerns. Westley could have been reaching for a weapon or concealing contraband, and Rayho's decision to immediately assess the situation was justified under the circumstances.

When Rayho returned to the driver's side of the Ford, his reasonable suspicion concerning whether the Ford had been stolen

remained. In fact, Westley's furtive movement added to Rayho's suspicions that criminal activity might be afoot. At that point, Rayho used a reasonable investigative approach to confirm or dispel his suspicions by asking Tanguay additional questions about his license.

Tanguay argues that the stop escalated to a de facto arrest when he and Rayho walked to the back of the Ford to retrieve his driver's license. Tanguay asserts that this encounter was a de facto arrest because Rayho compelled him to reveal the location of his license and then forced him to walk to the back of the Ford to retrieve it. The record does not support Tanguay's theory.

When Rayho asked Tanguay if he had his license the second time, Tanguay told him it was in the back of the Ford and then volunteered to retrieve it. There is no evidence that Rayho coerced Tanguay to reveal the location of his license or to accompany him to the back of the Ford. The only restriction that Rayho placed on Tanguay during this time was when he told him that he preferred, for officer safety purposes, to reach into the backpack to retrieve the license. That de minimis restriction on Tanguay's freedom of movement, however, falls far short of the coercive action necessary to signal to a reasonable person that he is under arrest. See United States v. Fornia-Castillo, 408 F.3d 52, 64-65 (1st Cir. 2005) (no de facto arrest

where officer handcuffed suspect and drew his weapon).
Moreover, that restriction was justified based on the obvious
safety risk of allowing a suspect to reach into a bag that could
conceal weapons, particularly in view of the fact that when
Tanguay got out of the Ford, Rayho had seen what appeared to be
the butt of a pistol tucked into the side of the driver's door.

In addition, Tanguay argues that the stop became a de facto
arrest when he was required to stand with Earnshaw while Rayho
checked the BB gun.  Once Rayho observed what appeared to be a
firearm in the Ford, it was reasonable for him to temporarily
seize the suspected firearm as a safety precaution.[8]  Directing
Tanguay to stand near Earnshaw while he assessed the danger
posed by the suspected firearm was of minimal intrusiveness and
would not have signaled to a reasonable person that he was under
arrest.  See United States v. Campa, 234 F.3d 733, 738–39 (1st
Cir. 2000) (directing suspects to move a few steps to another
room did not result in a de facto arrest).  There is no evidence

---

[8] Flanegan v. O'Leary, 2015 WL 5311271, at *3 (W.D. Pa.
Sept. 11, 2015) (upholding temporary seizure of gun during
traffic stop); United States v. Reynolds, 2009 WL 1090674, *10
(D.Me. Apr. 21, 2009) (holding that temporary seizure of gun was
a reasonable precaution during investigation); see also United
States v. Koepnick, 2011 WL 134102, *1 (9th Cir. Jan.13, 2011)
(noting that "every circuit to confront [the] question" of
whether police may temporarily seize a gun while executing a
warrant has upheld the practice as "a reasonable safety
precaution"); United States v. Timpani, 665 F.2d 1, 5 (1st Cir.
1981)(police may seize weapons while executing search warrant).

that Earnshaw physically restrained Tanguay, used any force, or that either officer told Tanguay that he was under arrest. There is no other evidence in the record that would demonstrate the level of coercion necessary to escalate the encounter to a de facto arrest.

Tanguay also argues that Rayho improperly extended the stop after checking the BB gun because at that point there was no observable criminal activity. Rayho still had been unable to confirm or deny his suspicions concerning whether the Ford was stolen. Moreover, he now knew that Tanguay had lied to him about having his license and had not told him about the BB gun in the front door when he had asked whether there were any weapons in the Ford. Under these circumstances, Rayho was justified in continuing his investigation.

In any case, Rayho's next investigative activity was asking Tanguay for consent to search the car, a question that did not appreciably extend the stop and one for which no reasonable suspicion is necessary. Florida v. Bostick, 501 U.S. 429, 429 (1991) ("Even when officers have no basis for suspecting a particular individual, they may generally ask the individual questions . . . and request consent to search luggage . . . provided they do not convey a message that compliance with their requests is required.") (internal citations and quotations omitted)); United States v. Turvin, 517 F.3d 1097, 1103-04 (9th

Cir. 2008) (officer's "request for consent to search did not unreasonably prolong the duration of the stop").

Finally, Tanguay contends that the duration of the stop was too long because, by his estimate, it was at least thirty minutes. The court disagrees. On the whole, Rayho's actions throughout the sequence of events were reasonably calculated investigative measures designed to confirm or dispel his suspicions or to protect his safety. Moreover, given the unfolding events of the stop, Tanguay's thirty-minute estimate is not an unreasonably long duration. The First Circuit has upheld similar traffic stops that were longer in duration. See Owens, 167 F.3d at 749 (fifty-five minute stop necessary to determine whether driver had license and whether passenger had authority to drive car); United States v. Sowers, 136 F.3d 24, 28 (1st Cir. 1998) (upholding stop of "at least thirty minutes").

## II.  Consent to Search the Ford

Tanguay argues that the evidence from the backpack should be suppressed because it is a fruit of the illegal search of the Ford. In support, Tanguay asserts that the when Rayho obtained his consent to search the Ford, it amounted to "a coerced consent to search." In response, the government argues that it obtained Tanguay's consent lawfully.

"Consensual searches are a recognized exception to the Fourth Amendment's warrant requirement, but the government bears the burden to prove by a preponderance of the evidence that defendant or an authorized third party gave the consent voluntarily." United States v. Pérez-Díaz, 848 F.3d 33, 39 (1st Cir. 2017) (quoting United States v. Vanvliet, 542 F.3d 259, 264 (1st Cir. 2008)). "Whether the consent was given voluntarily is a question of fact that 'turns on the district court's comprehensive assessment of the totality of the circumstances attending the interaction between defendant/third party and the searching officers.'" Id. (internal quotation marks omitted). "Factors to be weighed in making this comprehensive assessment include, but are not limited to, (i) the consenter's age, education, past experiences, and intelligence; (ii) whether law enforcement officials advised the consenter of his constitutional right to refuse consent; (iii) the length and conditions of the consenter's detention and/or questioning; and (iv) law enforcement officials' use of any inherently coercive tactics." Id. (internal quotation marks omitted).

Before Rayho requested consent to search the Ford, the encounter resembled an ordinary, non-coercive traffic stop. Rayho had attempted to determine if Tanguay had a driver's license and to check the records of the Ford. Although Tanguay did exit the vehicle, he did so voluntarily and not under any

coercion.  Neither officer used coercive language, spoke in a
threatening tone, drew a weapon, or used physical force against
either Westley or Tanguay.  Rather, most of the encounter
proceeded with Rayho making requests and Tanguay agreeing to
those requests.  Finally, the entire encounter lasted under
thirty minutes and was not the type of lengthy detention that
could undermine a finding a voluntariness.

In addition, the evidence concerning Rayho's interactions
with Tanguay do not suggest that he was intimidated in a way
that would render his consent involuntary.  Throughout the
encounter, Tanguay interacted with Rayho in an intelligent and
confident manner.  He agreed to a records check and assured
Rayho that he had a valid driver's license.  He also assured
Rayho that the suspected firearm was merely a BB gun.  Finally,
his response that it was "fine" for Rayho to search the Ford
also demonstrates a lack of vulnerability.

The only factor that might weigh against a finding of
voluntariness is that Rayho did not inform Tanguay that he had a
right to refuse to consent to search.  That factor alone,
however, is not dispositive.  Brake, 666 F.3d 800, 806 (1st Cir.
2011) (observing that "there is no requirement that the person
who gave consent must have been explicitly advised of the right
to withhold it").  Based on the totality of the circumstances

presented here, the court finds that Tanguay voluntarily gave consent for Rayho to search the Ford.

III. <u>Warrantless Search of the Backpack</u>

Tanguay contends that the contents of the backpack should be suppressed because it was searched pursuant to an illegal inventory search of the Ford. In support, Tanguay argues that Rayho did not catalogue the backpack or deposit it in the locker, as the Nashua Police Department's inventory search policy required. Tanguay also argues that Rayho did not obtain a warrant before searching the backpack, as the inventory search policy required for locked containers. In response, the government does not argue that a valid inventory search occurred. Rather, the government argues that the search of the backpack was valid under the consent exception, the automobile exception, and the inevitable discovery exception to the warrant requirement.

The court focuses on the automobile exception because it is dispositive. "Under the 'automobile exception' to the Fourth Amendment, police officers may seize and search an automobile prior to obtaining a warrant where they have probable cause to believe that the automobile contains contraband." <u>United States v. Silva</u>, 742 F.3d 1, 7 (1st Cir. 2014). Under this exception, "if probable cause justifies the search of a lawfully stopped

vehicle, it justifies the search of <u>every part of the vehicle</u> <u>and its contents</u> that may conceal the object of the search."
United States v. Goncalves, 642 F.3d 245, 249-50 (1st Cir. 2011) (quoting Wyoming v. Houghton, 526 U.S. 295, 301 (1999)). Accordingly, the exception permits "a probing search of compartments and containers within the automobile so long as the search is supported by probable cause." California v. Acevedo, 500 U.S. 565, 570 (1991) (internal quotation marks omitted) (allowing police to conduct warrantless search of bag located in trunk of car).

The exception "is not restricted temporally" and thus there is "no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure." United States v. McHugh, 769 F.2d 860, 865 (1st Cir. 1985). Accordingly, under the exception, law enforcement may seize the vehicle, relocate it to the police station, and search its contents there. United States v. Lopez, 380 F.3d 538, 545 (1st Cir. 2004). Likewise, the automobile exception allows law enforcement to seize a vehicle, remove any containers that they have probable cause to believe are concealing contraband, and search those containers without a warrant so long as the search is done within a reasonable time frame. United States v. Johns, 469 U.S. 478, 485-86 (1985) (allowing

warrantless search of containers three days after being removed from trucks); United States v. Oliver, 363 F.3d 1061, 1068 (10th Cir. 2004) ("[B]ecause police had probable cause to believe that package in automobile contained contraband, automobile exception permitted package's warrantless seizure and subsequent search at police station." (internal citation omitted)); United States v. Albers, 136 F.3d 670, 674 (9th Cir. 1998).[9]

To take advantage of the automobile exception, "the government must demonstrate that law enforcement officers had a belief, reasonably arising out of circumstances known to the seizing officer, that the vehicle contained that which by law is subject to seizure." United States v. Bucci, 582 F.3d 108, 117 (1st Cir. 2009). This standard is satisfied "when the totality of the circumstances create a fair probability that evidence of a crime will be found in a particular place." United States v. White, 804 F.3d 132, 136 (1st Cir. 2015), cert. denied. 136 S. Ct. 1229 (2016).

The government contends that the automobile exception applies here because Rayho had probable cause to believe that

---

[9] Wayne R. LaFave, 3 Search and Seizure § 7.2(d) n.161 (5th ed. 2016) ("[I]f there is probable cause as to a package in the vehicle, the package may be removed and then may be searched without a warrant with a reasonable time after its removal from the vehicle." (internal quotation marks omitted).

the Ford and the backpack contained contraband.  The facts
support the government's argument.  At the time of the
search, Rayho had already discovered what appeared to be
narcotics and drug paraphernalia in a sunglass case inside
the Ford.  Evidence of narcotics or drug paraphernalia found
in a vehicle supports probable cause to search the entire
vehicle for narcotics.  United States v. Staula, 80 F.3d 596,
603 (1st Cir. 1996) ("Here, [the officer's] discovery of the
marijuana gave him probable cause to continue to hunt within
the passenger compartment for more contraband."); see also
United States v. Barmore, 2017 WL 672040, at *1 (5th Cir. Feb.
20, 2017) (attempt to conceal drug pipe provided probable cause
"to believe that there were other items of contraband related to
illegal drug activity in the truck"); United States v. Richmond,
577 F. Appx. 627, 628 (8th Cir. 2014) (discovery of drugs in
vehicle provided probable cause to believe the rest of vehicle
contained narcotics).

    Moreover, other facts would have led a reasonable person to
conclude that the Ford contained contraband.  Rayho had evidence
that Tanguay and Westley were involved in either drug use or
trafficking.  A confidential informant had told Rayho that a
person with the name "Eric Tanguay" was involved in drug use and
distribution.  The presence of drugs in the Ford and the fact

that Tanguay's wallet contained a large amount of cash also suggested that Tanguay was involved in narcotics distribution. Further, Tanguay himself had informed Rayho that he assumed the sunglass case contained drugs because Westley was a drug user.

Finally, Tanguay and Westley's behavior suggested that they were concealing contraband in the Ford and, specifically, in the backpack. Both Tanguay and Westley did not tell the truth about having their driver's licenses with them. Tanguay did not tell the truth about the presence of the BB gun in the Ford. Tanguay and Westley gave different accounts of where they had been and who was in possession of the Ford before the encounter. Tanguay's backpack was secured with a padlock, and when asked about it he became nervous and gave an implausible explanation for why the backpack was locked. See United States v. Goode, 2011 WL 6302553, at *4 (E.D. Pa. Dec. 16, 2011) (defendant's nervous behavior and implausible answers to questions contributed to finding of probable cause to search vehicle for contraband), aff'd sub nom. United States v. Mebrtatu, 543 F. App'x 137 (3d Cir. 2013), and aff'd, 550 F. App'x 84 (3rd Cir. 2013).

Based on those facts, Rayho had probable cause to search the Ford and the backpack for contraband under the automobile exception. Because Rayho had probable cause to believe that the

backpack contained contraband, he was also entitled to remove it from the Ford and search it within a reasonable time frame. Given that Rayho searched the backpack within hours of the stop, the search did occur within a reasonable time. Therefore, Rayho's warrantless search of the backpack was permissible under the automobile exception to the warrant requirement.

The warrantless search of the backpack at the police station was further justified because Tanguay voluntarily consented to the search. Although the fact Tanguay was in custody is not enough by itself to render consent involuntary, it does raise a "sensitivity to the heightened possibility of coercion." United States v. Jones, 523 F.3d 31, 38 (1st Cir. 2008). In addition, the early hour when Rayho questioned Tanguay is another factor weighing against voluntariness. United States v. Real Prop. & Premises Known as 90-23 201st St., Hollis, N.Y., 775 F. Supp. 2d 545, 556 (E.D.N.Y. 2011).

Nevertheless, based on the totality of the circumstances, the court concludes that Tanguay provided voluntary consent to search his backpack. Rayho's testimony of the interview demonstrates that it was a civil discussion free of any inherently coercive tactics. Rayho read Tanguay's Miranda rights to him, and Tanguay executed a form acknowledging that

he understood them.  Further, before providing consent,
Tanguay executed a consent to search form, in which he
authorized the Nashua Police Department to search his
backpack and acknowledged that he had been informed of his
"right to refuse to consent" to the search.  Rayho also
informed Tanguay that if he chose not to provide consent, he
could still be booked and have his bail set.[10]  Rayho did not,
contrary to Tanguay's assertion, imply or state that Tanguay
would not receive bail unless he consented to the search.
Taken together, these facts demonstrate that the interview
was not coercive.

Therefore, the government had the authority to conduct a
warrantless search of the backpack based on Tanguay's
consent.[11]

---

[10] Although Rayho did tell Tanguay that he believed that he
had probable cause to obtain a warrant to search the backpack,
that statement cannot be considered misleading, especially given
that Tanguay had admitted that the backpack contained illegal
items.  United States v. Vazquez, 724 F.3d 15, 22 (1st Cir.
2013)("[T]he law is . . . clear that consent to a search is
not invalid merely because it is secured by an officer's
accurate assurance that there will soon be a lawful search
anyway).

[11] Because the court concludes that the warrantless search
of the backpack was justified under other exceptions, the court
need not consider whether the inevitable discovery exception
applies here.

## Conclusion

For the foregoing reasons, Tanguay's motion to suppress evidence (doc. no. 13) is denied.

SO ORDERED.


_____
Joseph A. DiClerico, Jr.
United States District Judge


April 27, 2017

cc:   Jennifer C. Davis, Esq.
      Stanley W. Norkunas, Esq.
      U.S. Probation
      U.S. Marshal